IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **KATHY WATSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 15-cv-112-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Kathy Watson seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in October, 2011, alleging disability beginning on July 8, 2010.   After holding an evidentiary hearing, ALJ Victoria A. Ferrer denied the application in a written decision dated October 2, 2013.  (Tr. 10-22).   The Appeals Council denied review, and the decision of the ALJ became the final agency decision.   (Tr. 1).   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 14.

1

1. The ALJ erred in weighing the medical opinions.

2. The ALJ erred in her consideration of GAF scores.

3. The ALJ erred in not giving appropriate weight to a functional capacity exam and to the opinion of a rehabilitation counselor.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the

listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to

establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Watson was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ**.** *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). At the same time, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## <u>The Decision of the ALJ</u>

ALJ Ferrer followed the five-step analytical framework described above.

4

She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that she was insured for DIB through September 30, 2014.   She found that plaintiff had severe impairments of disc disease of the lumbar spine, degenerative joint disease of the left knee, major depressive disorder, posttraumatic stress disorder, personality disorder, and pain disorder associated with psychological and general medical condition.   She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Watson had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical and mental limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.   **Agency Forms**

Plaintiff was born in 1964, and was 45 years old on the alleged onset date of July 8, 2010.   (Tr. 167).   She alleged disability because of back and knee problems and depression.   She was 5'5" tall and weighed 150 pounds.   (Tr. 171). She had worked in a factory.   (Tr. 172).

Plaintiff submitted a Function Report in April 2012 stating that workers' compensation had stopped paying for treatment.   She had back pain and could sit for only 5 to 10 minutes.   She had pain in her left knee.   Her knee locked up and caused her to fall at times.   She lived alone and did very little around the house. She washed dishes and mowed the yard.   It took her "days" to mow.   Her mother helped her and finished what she could not do.   She had to use a motorized cart in the store.   She used a cane.   Since her medications and treatment had been discontinued, she felt like hurting herself at times.   (Tr. 223-232).

### 2.   Evidentiary Hearing

Ms. Watson was represented by an attorney at the evidentiary hearing on September 18, 2013.   (Tr. 31).

Plaintiff testified that she hurt her back on July 8, 2010.   She returned to work on light duty but was laid off in September 2010 because there was no more available light duty work.   She worked in a plastics factory.   (Tr. 34).

At the time of the hearing, she was being treated for mental issues, but not for her knee or back.   (Tr. 35).   She was last prescribed pain medication in 2010. She used a cane.   It was prescribed by Dr. Templer in 2009.   She used the cane at all times.   (Tr. 40-41).

Plaintiff lived alone in a house.   She tried to clean and cook.   Her mother did her laundry, and her boyfriend mowed the grass.   She only drove to the grocery store.   (Tr. 43-44).   Her mother came over to help her every day.   (Tr. 65).

Plaintiff testified that she could not work because she could sit for only 10 to 15 minutes, and then she had to stand up or lay down.   She could not concentrate

and her mind wandered.   (Tr. 59).   She spent 90% of her day lying down.   Her medications made her unable to concentrate.   (Tr. 61).   She had numbness and tingling down her left leg and constant muscle spasms in her back.   (Tr. 63-64).

Ms. Watson had injections for her back, but they did not help at all.   She used a TENS unit every day, which helped.   (Tr. 49).

Plaintiff was hospitalized for mental issues in 2013, and began seeing a psychiatrist thereafter.   She saw her once a month.   The doctor prescribed medication for her.   Plaintiff testified that she still had depression, racing thoughts, and suicidal thoughts at times.   The doctor was adjusting her medications.   (Tr. 51-53).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level, limited to standing/walking for a total of 2 hours a day and sitting for a total of 6 hours a day; only occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; and occasional stooping, crouching, kneeling and crawling. She was limited to simple, routine, repetitive tasks and simple instructions; only occasional interaction with coworkers and supervisors; and no interaction with the general public.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do.   Examples of such jobs are hand bander, weight tester, and surveillance system monitor.   (Tr. 71-73).

The VE testified that plaintiff would be able to do only the surveillance system

7

monitor job if she needed to use a cane.   (Tr. 74).

### 3.   Medical Treatment

Ms. Watson hurt her knee and low back at work in 2005.   She had arthroscopic surgery on the knee, and returned to work.   Her knee gave way and she fell at work in 2008, resulting in low back pain radiating into her left leg.   (Tr. 346).   In July 2009, Dr. Don Kovalsky, who practiced at the Orthopedic Center of Southern Illinois, noted that a lumber MRI showed an annular tear at L4-5 on the left, without any neural compression.   She had no significant disc space narrowing, minimal dehydration and minimal internal derangement of the L4-5 disc.   The rest of the lumbar levels were "absolutely normal."   He did not recommend surgery because she had "very mild pathology with a small annular tear."   He recommended pain management.   (Tr. 345).

Dr. Templer at the Orthopedic Center of Southern Illinois gave plaintiff an epidural injection and prescribed Percocet, which was later switched to Hydrocodone.   He prescribed a TENS unit in December 2009.   (Tr. 332).

Plaintiff alleges that she became disabled as of July 8, 2010.   She saw Dr. Ben Houle, who practiced with Dr. Templer, on July 12, 2010.   She told Dr. Houle that she had a feeling of locking and catching in the anterior part of her left knee following her 2005 injury.   She recently began having intermittent pain in the left knee.   On exam, there was no swelling of the knee.   She was unable to fully extend the leg, lacking about 10 to 15 degrees of extension.   X-rays did not demonstrate any obvious pathology.   He recommended an MRI.   (Tr. 318).

On August 17, 2010, Dr. Templer saw plaintiff for follow up of her back pain.

8

On exam, she had some tenderness of the lumbar paraspinal region and in the tailbone.   She was continued on Hydrocodone and Relafen.   Dr. Templer prescribed Elavil as a sleep aid.   (Tr. 314).   In November 2010, Dr. Templer noted that a recent ganglion impar block had significantly helped with her low back and buttocks pain.   She had a normal gait with no focal deficits in the lower extremities.   (Tr. 311).

An MRI of the left knee done in November 2010 showed "tiny joint effusion" and no evidence of internal derangement.   (Tr. 360-361).    In December 2010, Dr. Houle noted the MRI results.   He did not recommend surgery.   He noted that she was able to make her knee pop "quite severely" by getting into "an eccentric contraction of the quadriceps."   He felt she was at maximum medical improvement with regard to her knee injury.   (Tr. 309).

Plaintiff continued to see Dr. Templer every month or so for pain in her back and buttocks.   He noted that she had a normal gait in December 2010 and February 2011.   A repeat ganglion impar injection gave her significant long-lasting relief of her pain.   (303-306).

An MRI of the sacrum and coccyx done in May 2011 was unremarkable. (Tr. 358).

In July 2011, Dr. Templer wrote that plaintiff had not gotten significant relief from either epidural steroid injections or ganglion impar injections.   He again noted that she ambulated with a normal gait.   He felt that she had probably reached maximum medical improvement, and recommended a functional capacity exam.   She was to continue taking Cymbalta.   (Tr. 298).   Dr. Templer noted in

August 2011 that the FCE showed that she was not able to work at a sedentary job for an eight hour day.   (Tr. 295).

Dr. Adrian Feinerman performed a consultative physical exam on December 28, 2011.   Ms. Watson complained of pain in her back and left knee.   She said that she did not "walk or stand without a cane."   She was wearing a brace on her left knee and said that her knee gave out.   On exam, she was 5'5" tall and weighed 146 pounds.   There was no anatomic abnormality of any extremity and no redness, warmth, thickening or effusion of any joint.   She had a limited range of motion of the left knee.   Grip strength was strong and equal.   Muscle strength was normal, and there was no muscle spasm or atrophy.   Fine and gross manipulation were normal.   There was no anatomic abnormality of any segment of the spine.   She had a decreased range of motion of the lumbar spine.   Dr. Feinerman noted that she "would not walk or stand without a cane."   His impression was lumbar disc disease and degenerative joint disease.   (Tr. 432-442).

Plaintiff returned to the Orthopedic Center of Southern Illinois in December 2011 for evaluation of back pain.   She was due to have her pain medication refilled.   Dr. Templer had left the practice, so she was to be seen by Dr. Aiping Smith.   Because she was to see a new doctor, she was asked to sign a new narcotic agreement and to undergo a urine drug test.   Ms. Watson then told the nurse that she was "getting hot and sweaty" and needed to reschedule the appointment.   (Tr. 554-555).

Dr. Smith saw plaintiff on January 30, 2012.   On exam, she ambulated with a cane and wore a boot on her left foot.   She was unable to toe walk on the left but

was able to heel walk bilaterally.   She had moderately decreased trunk flexion/extension.   Facet maneuver did not reproduce pain at the waistline, but she complained of significant increased pain in the sacrum area.   Dr. Smith wrote that "On palpation, there is significant pain magnification behavior and reported diffuse tenderness involving the entire lumbar spine including facets/paraspinals, piriformis muscle, SI joint and entire sacrum region."   Dr. Smith's impression was (1) "significant pain magnification behavior;" (2) chronic low back pain with MRI evidence of only mild DDD at L4-5 and normal MRI of the sacrococcygeal region "which cannot explain the patient's severe pain;" (3) left knee pain with self-reported unstable knee cap; (4) "current left foot pain, self reported fracture, treated by outside physician;" and (5) pending litigation.   Because there was "no significant pathology" that would explain her pain, Dr. Smith would not continue her on Norco.   Instead, she switched her to Tylenol #3 and instructed her to gradually taper off narcotics.   She also recommended a repeat MRI.   She referred plaintiff to Dr. Freehill for her left knee.   (Tr. 551-552).

Ms. Watson received primary healthcare from Salem Medical Center (Southern Illinois Healthcare Foundation).   In March 2012, a provider there noted that she had chronic pain due secondary to ruptured disc, bulging disc and tear. She also had depression and would be referred for mental health treatment.   (Tr. 506).

On June 11, 2012, plaintiff was seen by an advanced practice nurse at Salem Medical Center for depression.   She said that she had suicidal thoughts.   She was told to go to St. Mary's emergency room.   (Tr. 593).

Plaintiff was admitted to St. Mary's Hospital in Centralia, Illinois, on June 12, 2012.   She had taken a "small overdose" of Tylenol and Vicodin.   She indicated that she had been unable to afford her medications and her depression had become increasingly severe.   She was treated with group therapy, Paxil and Trazodone.   She was discharged in improved condition two days later with Axis I diagnoses of major depression, recurrent severe, without psychosis, and marijuana abuse.   Her GAF at discharge was 55.   Discharge medications were Paxil, Trazodone, Robaxin as needed for muscle spasms, and Norco as needed for pain. (Tr. 615-617).

Following her hospitalization, Ms. Watson was to attend counselling at the Community Resource Center.   She was seen four times between June 19 and August 31, 2012.   (Tr. 575-588).   On August 17, her GAF was assessed at 58. (Tr. 583).   On the last visit, Ms. Watson and her counsellor were to begin writing her individual treatment plan goals, but Ms. Watson did not feel well.   (Tr. 585). Ms. Watson's counsellor left the agency, and Ms. Watson did not return for further visits.   Her GAF was rated at 58 at both the opening and closing of counselling. (Tr. 590).

Ms. Watson also received mental health treatment at Salem Medical Center. She was seen there by Sharon Szatkowski, a board certified Psychiatric and Mental Health Clinical Nurse Specialist ("PMHCNS-BC").   On the first visit, June 26, 2012, Nurse Szatkowski diagnosed PTSD and depression, rule out bipolar

disorder.   She assessed plaintiff's GAF at 40.   She prescribed Latuda and Elavil.[2]

(Tr. 599).   About two weeks later, Ms. Watson still had some mood swings and

racing thoughts.   She was to increase the dosage of Latuda and add Paxil.   (Tr.

600).

Ms. Watson returned to Dr. Smith in July 2012.   The referral to Dr. Freehill

and the repeat MRI had been denied by workers' comp.   Plaintiff said that her

family doctor had been prescribing Vicodin, but he wanted her to see a pain doctor

for further refills.   Plaintiff complained of pain in the lower back and tailbone area.

Dr. Smith wrote, "On palpation, my finger barely touches the dressing over her skin

and she has severe magnification behavior so I am not able to examine her at all."

She noted that workers' comp would not approve any studies or treatment, so

plaintiff was not scheduled for any follow-up with her.   (Tr. 541).

Plaintiff saw Nurse Szatkowski five more times from August 2012 through

February 2013.   (Tr. 601-611).   The records reflect that her symptoms waxed and

waned and that her medications were adjusted.   Nurse Szatkowski assessed her

GAF at 50.   In September 2012, plaintiff denied mood swings and racing thoughts,

but had some suicidal thoughts.   (Tr. 602).   In October 2012, she reported no

suicidal thoughts and no hallucinations or paranoia.   (Tr. 609).   However, in

January 2013, plaintiff said she had some suicidal thoughts, but they were not

constant.   She also kept thinking that someone was following her and that

someone was outside.   Her behavior was agitated and her speech was loud and

---

[2] Latuda is an antipsychotic medication used to treat depression and bipolar disorder. www.drugs
.com/latuda.html. Elavil is an antidepressant. www.drugs.com/elavil.html. Both websites were
visited on July 20, 2016.

pressured.   She had poor concentration and flight of ideas.   Her medications were adjusted.   (Tr. 606-608).   In February 2013, she was doing better.   She reported no suicidal ideas and, on mental status exam, her behavior and speech were appropriate and her attention was maintained.   Thought processes were logical and thought content was unremarkable.   (Tr. 603-605).

In April 2013, Ms. Watson presented to Nurse Szatkowski with difficulty concentrating, thoughts of death or suicide, and anger.   Her behavior was agitated and psychomotor behaviors were hyperactive.   Speech was pressured, loud and excessive.   Affect was labile and mood was labile and irritable.   She expressed suicidal ideation.   (Tr. 637-639).   The notes for the next visit, about three weeks later, are similar except that plaintiff did not express suicidal thoughts.   (Tr. 640-642).   In June 2013, she presented with a depressed mood, difficulty sleeping, racing thoughts, restlessness and anger.   She said she had difficulty affording treatment by Nurse Szatkowski and by a medical doctor.   She was getting to the point where she did not care about anything.   The nurse again noted agitated behavior and pressured, loud and excessive speech.   Her attention was distracted. Wellbutrin was added to her medications.   (Tr. 643-645).   On the last visit, July 30, 2013, Ms. Watson presented with restlessness, but denied depressed mood or difficulty concentrating.   She did not express suicidal thoughts.   Her behavior was unremarkable and her speech was appropriate.   She was to continue taking Wellbutrin, Saphris, Paxil and Amitriptyline (Elavil).   Nurse Szatkowski again noted that "Current GAF: 50 on 10/05/2012."   (Tr. 646-648).

**4.**   **Examination by Dr. Stillings**

14

Wayne Stillings, M.D., a board certified psychiatrist, examined Ms. Watson in October 2012 in connection with her workers' compensation claim.   (Tr. 527-538). Ms. Watson gave a history of emotional, physical and sexual abuse by her stepfather and older brother when she was a child.   She reported the onset of chronic major depressive disorder as well as chronic PTSD in childhood.   However, she received no psychiatric treatment until her admission to St. Mary's Hospital in February 2012.   Mental status exam showed that her speech was normal and her thoughts were logical.   She displayed psychological distress regarding her history of abuse and her work injuries and associated debility.   Dr. Stillings observed no signs of symptom magnification.   Her mood was depressed.   She denied suicidal ideation. Recent and remote memory were intact.   Self-insight was limited.   Dr. Stillings noted that the SIMS (Structured Inventory of Malingered Symptomatology) indicated that she was not overreporting/magnifying her symptoms.   He diagnosed PTSD, major depressive disorder, and pain disorder associated with both psychological factors and a general medical condition.   He assessed her GAF at 48 to 52, which he said indicated moderate to serious symptoms.

**5.    Dr. Templer's Opinions**

Dr. Templer completed a certification for a disabled parking placard.   He checked the box for "is severely limited in the person's ability to walk due to an arthritic, neurological or orthopedic condition."   This document is undated.   (Tr. 282).

In a note dated August 30, 2011, Dr. Templer wrote that plaintiff had reached "maximum medical improvement" and had been placed on "permanent

restrictions."   He did not specify those restrictions.   He stated that "Per her FCE [functional capacity exam] she is not able to work a sedentary eight hour day."   (Tr. 295).

### 6.    Work Performance Evaluation

A functional capacity exam was done in August 2011.   (Tr. 417-427).   This evaluation took almost 3 hours and 45 minutes.   The conclusion was that plaintiff was capable of work at the sedentary exertional level, but that she could not sustain sedentary work for an 8 hour day, 5 days a week.   Among other observations, the evaluator noted that plaintiff exhibited self-limiting behavior on only 5% of the 21 tasks evaluated, and that "research indicates that motivated clients self-limit on no more than 20% of test items."   (Tr. 417).   At the end of testing, Ms. Watson had an "area over her coccyx that has swollen to baseball size over the course of the evaluation today."   Her gait was "slower and more labored" than it had been upon her arrival.   (Tr. 422).   No significant clinical inconsistencies were noted, and the evaluator concluded that there was "very weak evidence of low effort and inconsistent behavior."   (Tr. 423).

### 7.    Assessment by Rehabilitation Counselor

Certified Rehabilitation Counselor J. Stephen Dolan met with plaintiff in August 2012 and prepared a Vocational and Rehabilitation Assessment dated September 4, 2012.   (Tr. 241-250).   Mr. Dolan concluded that, based on plaintiff's education, work experience, academic skills, work skills, and the limitations listed in the August 2011 functional capacity exam, she is "unable to perform any employment for which a reasonably stable market exists."   (Tr. 249).

16

Mr. Dolan later reviewed Dr. Stillings' report and stated that it supported the opinion expressed in his September 2012 report.   (Tr. 253).

### Analysis

The Court agrees that the ALJ was inconsistent in her handling of the various GAF scores.

The GAF score, a numeric scale of 0 to 100, was used by clinicians to assess severity of symptoms and functional level.   The use of the GAF metric was discontinued in the 5th Edition of the *Diagnostic & Statistical Manual of Mental Disorders*, issued in 2013.   See, *Yurt v. Colvin*, 758 F.3d 850, 853, n. 2 (7th Cir. 2014).

A GAF score "does not reflect the clinician's opinion of functional capacity," and the ALJ is not required to rely on it to assess whether a claimant is disabled. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).     However, while she is not required to rely on a GAF score, the ALJ errs when she accepts high scores while ignoring lower scores reflected in the record.   *Yurt,* 758 F.3d at 859-860.   This is in keeping with the well-established rule that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it."   *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

Here, ALJ Ferrer did not literally ignore the lower GAF scores, but she might as well have because the reasons she gave for rejecting the lower scores are transparently insufficient.   The ALJ gave "little weight" to the GAF scores assessed by Nurse Szatkowski in June 2012 (40) and October 2012 (50).   She acknowledged that a GAF score between 41 and 50 indicates "serious symptoms or

a serious impairment in social, occupational, or school functioning." However, she went on to recite that a GAF score is not based on objective medical findings, but represents the clinician's judgment as to the severity of the patient's symptoms, and that a GAF score is not a rating of the patient's ability to work. Lastly, she asserted that the scores assessed by Nurse Szatkowski were not consistent with the mental health records, which showed improvement with treatment. See, Tr. 19.

Despite her observations about GAF scores in general, the ALJ gave "great weight" to the GAF score of 58 assessed by a counsellor at the Community Resource Center in August 2012. In addition, she gave "some weight" to the GAF score of 48 to 52 assessed by Dr. Stillings.

The ALJ failed to give a good reason for rejecting the GAF scores assigned by Nurse Szatkowski. Her general comments about GAF scores do not suffice, since she did not find that those reasons mandated rejection of the higher score assigned by the counsellor. And, her observation that Nurse Szatkowski's scores were not consistent with the medical records is belied by the records.

The ALJ's statement that plaintiff showed "improvement with treatment" is a mischaracterization of the records. Nurse Szatkowski's notes simply do not document an upward trajectory as suggested by the ALJ. Rather, they indicate that Ms. Watson's symptoms waxed and waned over time. Symptoms that wax and wane "are not inconsistent with a diagnosis of recurrent, major depression." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

The bottom line is that ALJ gave no good reason for accepting the highest GAF score and rejecting the lower scores. The Commissioner's defense on this

18

point is completely off-base.   She argues that the ALJ was justified in rejecting the lower scores because they were assessed in 2008 and 2009, before the alleged date of disability.   See, Doc. 30, pp. 12-13.   This is incorrect.   Nurse Szatkowski began seeing plaintiff in June 2012 and Dr. Stillings saw plaintiff in October 2012.

The Commissioner misreads the ALJ's decision.   In the first paragraph on Tr. 20, she did say that she gave little weight to opinions rendered in 2008 and 2009 because they predated the alleged date of onset.   She cited to Ex. 23F, pages 19 and 51.   Those records from 2008 and 2009 (Tr. 742 and 774) have nothing to do with GAF scores or plaintiff's mental health.

For similar reasons, the Court agrees that the ALJ erred with respect to the functional capacity exam and Mr. Dolan's vocational assessment report.

The ALJ rejected the conclusion expressed in the functional capacity exam report with the blanket statement that the medical evidence did not support the conclusion that plaintiff could not sustain full-time sedentary work.   (Tr. 20). However, she did not mention the observations in the report that supported its conclusion, such as the baseball-sized swollen area over the coccyx that developed during the evaluation, or that plaintiff's gait had become slower and more labored. Further, the evaluator concluded that plaintiff made a good effort during the testing.

Again, an ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion.   *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).   While she is not required to mention every piece of evidence, she "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."   *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

19

The ALJ rejected Mr. Dolan's opinion because he is not an acceptable medical source and the issue of whether plaintiff is able to work is reserved to the Commissioner.   (Tr. 20).   The first reason is nonsensical; Mr. Dolan was expressing his opinion as a vocational expert.   He did not attempt to express a medical opinion.   The second reason is also off-base.   Similar to the vocational expert who testified at the evidentiary hearing, Mr. Dolan was expressing his opinion as to whether plaintiff could "perform any employment for which a reasonably stable market exists."   (Tr. 249).   Despite her view that the issue of whether plaintiff is able to work is reserved to the Commissioner, she accepted the opinion of the vocational expert who testified at the hearing.   It was error for her to reject Mr. Dolan's opinion for that reason while not applying the same rule to the testifying vocational expert.   See, *Bjornson v. Astrue*, 671 F.3d 640, 648 (7th Cir. 2012), criticizing an ALJ for rejecting one doctor's opinion because it was on an issue reserved to the Commissioner, while accepting the opinion of a second doctor on the same issue.

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and [her] conclusions."   *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted.   The ALJ fails to build the requisite logical bridge where she relies on evidence which "does not support the propositions for which it is cited. "   *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).   The Court must conclude that ALJ Ferrer failed to build the requisite logical bridge here. Remand is required where, as here, the decision "lacks evidentiary support or is so

20

poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2010), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Watson is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying Kathy Watson's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:      July 21, 2016.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

21